**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-1835**

THE KANAWHA-GAULEY COAL & COKE COMPANY,

Plaintiff - Appellee,

v.

PITTSTON MINERALS GROUP, INCORPORATED,

Defendant - Appellant.

**No. 12-1037**

THE KANAWHA-GAULEY COAL & COKE COMPANY,

Plaintiff - Appellant,

v.

PITTSTON MINERALS GROUP, INCORPORATED,

Defendant - Appellee.

Appeals from the United States District Court for the Southern
District of West Virginia, at Charleston.  Joseph R. Goodwin,
Chief District Judge.  (2:09-cv-01278)

Argued:  October 24, 2012        Decided:  December 20, 2012

Before TRAXLER, Chief Judge, KEENAN, Circuit Judge, and R. Bryan
HARWELL, United States District Judge for the District of South
Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Wade Wallihan Massie, PENN, STUART & ESKRIDGE, Abingdon, Virginia, for Appellant/Cross-Appellee. Marshall R. Hixson, STITES & HARBISON, PLLC, Lexington, Kentucky, for Appellee/Cross-Appellant. **ON BRIEF:** Stephen L. Thompson, BARTH & THOMPSON, Charleston, West Virginia, for Appellant/Cross-Appellee. Paul O. Clay, Jr., Charleston, West Virginia; Gregory P. Parsons, STITES & HARBISON, PLLC, Lexington, Kentucky, for Appellee/Cross-Appellant.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Kanawha-Gauley Coal & Coke Company ("KG") and Pittston Minerals Group ("Pittston") bring this cross-appeal, challenging the judgment of the district court following a bench trial. We have reviewed the record. For the reasons below, we find no reversible error and affirm the judgment of the district court.

I.

A.

In January 1998, KG entered into a lease with Kanawha Development Corporation ("KDC"), a subsidiary of Pittston at the time. KG agreed to lease several thousand acres of its land in Fayette County, West Virginia, to KDC for mining purposes in exchange for receiving wheelage on coal transported across the premises and royalties on the coal mined from the premises. KDC also agreed to additional obligations under the lease, which included paying property taxes and taxes on the coal. In an agreement[1] attached to the lease, Pittston agreed to serve as a surety to KDC.[2]

---

[1] In the suretyship agreement, Pittston agreed to the following:

> (i) to be jointly bound with [KDC] in the performance of [KDC's] covenants set forth [in the lease] to the same extent as if it had been a joint lessee; (ii) to hold [KG] harmless from any cost, charge, expense or

(Continued)

3

Pittston sold its interest in KDC to Appalachian Coal Holdings ("ACH") in November 2003. Despite Pittston's attempts to end its surety relationship, KG declined to modify the agreement. Both the lease and the agreement, therefore, remained in effect after ACH's acquisition of KDC. After several years passed, the relationship between KG and KDC declined. KDC ceased mining on the property in mid-April 2008. By September of that year, KDC had failed to pay property taxes, as required by the lease, and soon thereafter KDC began failing to pay royalties on the coal it mined and sold.

In early March 2009, KG and KDC negotiated a payment plan to bring KDC's obligations current. Although ACH contributed

---

loss due to default under [the lease by KDC]; (iii) that [Pittston] consents in advance to any modification of [the] lease and that its liability shall be deemed modified in accordance with any such modification; (iv) that this guaranty applies to renewals, extensions and holdover terms of the [l]ease; (v) that this guaranty shall remain in effect notwithstanding an assignment of [the lease] or subletting of the [l]eased [p]remises by [KDC]; . . . (vii) that any and all agreements, modifications and supplements hereafter entered into between [KG] and [KDC] respecting [the] lease and/or [l]eased [p]remises shall not relieve, change or discharge the obligations of [Pittston] nor shall the consent of [Pittston] be required to make any such agreement, modification or supplements effective.

[2] The parties do not dispute the district court's finding that the agreement was a suretyship agreement.

4

several hundred thousand dollars on KDC's behalf, KDC ultimately failed to make its payments under the new plan. On May 22, 2009, KG sent notice of KDC's default to KDC and Pittston,[3] and Pittston received notice five days later. Both companies were given twenty days to cure the default, but they did nothing.[4] Having received no communication or payment from Pittston by June 19, 2009, KG gave notice to both KDC and Pittston that it was terminating the lease.

B.

KG filed suit against Pittston on September 25, 2009, seeking unpaid royalties, property taxes, and fines. KG also requested legal costs and attorney's fees. The district court denied the parties' cross-motions for summary judgment; however, the district court found KG, as a matter of law, "did not have a duty to enforce its lien against KDC before proceeding against Pittston, who unconditionally guaranteed KDC's performance under the lease." The case then proceeded to trial.

---

[3] Also, on June 10, 2009, KG gave a second notice of default to KDC and Pittston concerning KDC's failure to pay the required taxes and maintain certain insurance coverages required by the lease.

[4] Pittston only contacted ACH to demand indemnification.

5

Following a bench trial, the district court found that KDC had breached the lease and that Pittston did not prove its affirmative defense that KG breached its implied duty of good faith by failing to provide Pittston with timely notice of KDC's breaches under the lease. The district court also found that KG took reasonable steps to mitigate its damages and that reasonableness did not require KG to initiate litigation to enforce a landlord's lien against KDC before proceeding against Pittston.

The district court ultimately awarded KG $1,047,194.42 in unpaid royalties, $134,080.32 in unpaid interest on late unpaid royalties, $15,500 in late payment penalties, and $212,889.89 in unpaid taxes. It also ruled that KG was not entitled to attorney's fees because the suretyship agreement did not unambiguously provide for the recovery of such fees. The district court, therefore, entered judgment in favor of KG against Pittston for a total of $1,409,664.63. Subsequently, KG moved to alter or amend the judgment, contending that it was also entitled to post-judgment interest at the rate of 5.25% per annum for unpaid royalties. The district court, however, denied its request, and this cross-appeal followed.

Pittston first contends that the district court erred in ruling at the summary judgment stage that KG had no duty under West Virginia surety law to enforce a landlord's lien on coal and equipment owned by KDC.[5] Pittston asserts that, by failing to enforce the lien, KG impaired the collateral securing the debt KDC owed to KG. Because the collateral exceeded the debt, Pittston argues it cannot be held liable as a surety. We review de novo the district court's interpretation of West Virginia state law at the summary judgment stage. See Delebreau v. Bayview Loan Servicing, LLC, 680 F.3d 412, 415 (4th Cir. 2012).

We find no error in the district court's interpretation of West Virginia law. The district court recognized the unique nature of what the parties refer to as a landlord's lien, reasoning that "an unenforced inchoate landlord's lien creates an interest entirely different from an interest created by a secured transaction or lien obtained by attachment, judgment, or execution." The statutes cited by the parties codify the common law remedy of distress, which "authorized [a landlord] to distrain property of the tenant, and hold it as a sort of pledge

---

[5] The district court assumed for the purpose of its analysis that KG had a landlord's lien against the coal and equipment on the premises; however, it found the lien "inchoate" and held KG did not have a duty to enforce the landlord's lien.

to secure payment of rent." Nicholas L. DiVita, Conflicts Between the West Virginia Landlord's Lien and Article Nine of the Uniform Commercial Code, 86 W. Va. L. Rev. 417, 417 (1983); see also 49 Am. Jur. 2d Landlord & Tenant § 813. The codification modified the remedy of distress, adding procedural protections for the tenant, but also giving the landlord the option to later sell the personal property to satisfy a claim for rent. W. Va. Code §§ 37-6-12 to -13; DiVita, supra, at 418

The statutory "landlord's lien" in West Virginia is therefore a derivative of the distress remedy coupled with the superior priority of the interest a landlord has in a tenant's personal property once it is distrained. "This preferential right of payment operates as and has been held to constitute a lien." DiVita, supra, at 420; see also 49 Am. Jur. 2d Landlord & Tenant § 813 ("The right to distrain is not a strict lien, but rather is a peculiar right which is in the nature of a lien."). A tenant's personal property does not become collateral security for rent until a landlord petitions a court for a distress warrant, which in turn must be executed by a sheriff. See W. Va. Code § 37-6-17 (outlining the procedure for obtaining an order of attachment). The district court characterized the lien as inchoate; however, the term of art is more relevant in determining the priority of the landlord's interest in the tenant's personal property compared to other lienholders. See

8

*United States v. White*, 325 F. Supp. 1133, 1135 (S.D.W. Va. 1971). The priority of KG's interest is not at issue here. Instead, the issue simply was whether the character of KG's interest in KDC's coal and equipment was of the kind that required KG to enforce its lien before proceeding against Pittston.

West Virginia surety law provides as follows:

> [A] creditor [is] bound to use proper care and diligence in the management and collection of . . . collateral [securities in his hands], and . . . a surety is released, to the extent of the loss, actually sustained, by the negligence of the creditor, to the same extent as if lost by the positive act of the creditor.

*First Nat'l Bank of Philippi v. Kittle*, 71 S.E. 109, 110 (W. Va. 1911). The parties do not dispute the fact that KG never petitioned a court for an order of attachment or a distress warrant. While KG may very well have had an interest in KDC's personal property under the distress statutes, no specific collateral was mentioned in the lease to secure the royalties KDC owed. As such, no collateral was impaired so as to provide Pittston with a surety defense and reduce the damages KG could seek from Pittston. Thus, the district court did not err in

9

finding KG "did not have a duty to enforce its lien against KDC before proceeding against Pittston."[6]

## III.

We now turn to our review of the district court's judgment following a bench trial. "We review a judgment following a bench trial under a mixed standard of review-factual findings may be reversed only if clearly erroneous, while conclusions of law, including contract construction, are examined de novo." Roanoke Cement Co. v. Falk Corp., 413 F.3d 431 (4th Cir. 2005).

## A.

Pittston argues that the district court erred in concluding that KG had no duty to mitigate damages by enforcing its landlord's lien. The district court held that, under West Virginia law, the duty to mitigate "did not require [KG] to institute a separate, and likely costly, legal proceeding

---

[6] The district court also found Pittston, in the suretyship agreement, "provided [KG] with an unconditional guaranty of KDC's performance under the lease to the same extent as if it had been a joint lessee." Likewise, KG contends on appeal that the language of the suretyship agreement modified the surety relationship to the extent that Pittston waived its surety defenses. Due to this Court's dispositive holding that KG's interest was not of the kind to bar proceeding against Pittston, we need not determine the extent to which the agreement affected the surety relationship.

10

against its tenant to enforce [a] landlord's lien." Indeed, the district court noted the duty "requires only that an injured party take reasonable steps to avoid further losses." We find no error in the district court's holding, especially in light of its finding that KG acted reasonably in negotiating a payment plan and ultimately terminating the lease to avoid further losses. See Middle-West Concrete Forming & Equip. Co. v. Gen. Ins. Co., 267 S.E.2d 742, 747 (W. Va. 1980) ("[A]n injured party is responsible for doing only those things which can be accomplished at a reasonable expense and by reasonable efforts.").

Pittston next asserts that the district court erred in finding KG's notice to Pittston was adequate under the implied duty of good faith that is owed to a surety. The district court held the duty of good faith in West Virginia did "not require an obligor to provide additional notice to a surety."[7] We find no error in the district court's finding.

Under West Virginia law, a creditor "is bound to observe good faith with the surety." Leonard v. Cnty. Court of Jackson Cnty., 25 W. Va. 45 (W. Va. 1884). A creditor "must withhold

---

[7] The district court also found the suretyship agreement provided no additional notice requirement.

11

nothing, conceal nothing, release nothing which may possibly benefit the surety." Id.

> If a creditor does any act injurious to the surety, or inconsistent with his rights, or if he omits to do any act, when required by the surety, which his duty enjoins him to do, and the omission proves injurious to the surety, in all such cases the latter will be discharged, and he may set up such contract as a defense to any suit brought against him, if not at law, at all events in equity.

Id.

Nothing in the record suggests KG, in not notifying Pittston before May 22, 2009, withheld or concealed information from Pittston. Moreover, assuming that KG had a landlord's lien to enforce and that KG had a duty to enforce it before proceeding against Pittston, no collateral that may have possibly benefited Pittston had been released by KG before the notice of default and Pittston's right to cure was communicated. Indeed, Pittston's argument merely concerns KG's failure to give Pittston earlier notice of KDC's breaches. As the district court noted, after KG's notice of default, Pittston had twenty days to cure the breaches, but failed to do so. In light of these findings, the district court's finding was proper.

B.

In its cross-appeal, KG first argues that the district court erred in denying its request for attorney's fees. It

12

contends the suretyship agreement executed by Pittston unambiguously provides for attorney's fees in the event that KDC defaults under the lease. We disagree.

Under West Virginia law, each side must bear its own attorney's fees absent "express statutory or contractual authority for reimbursement." Corp. of Harpers Ferry v. Taylor, 711 S.E.2d 571, 574 (W. Va. 2011) (citing Sally-Mike Props. v. Yokum, 365 S.E.2d 246, 248 (W. Va. 1986)). The district court, in denying attorney's fees, relied on Harris v. Allstate Insurance Company, 540 S.E.2d 576 (W. Va. 2000), and found "the agreement between [KG] and Pittston does not unambiguously provide for the recovery of attorney fees and costs." The agreement at issue in Harris included a provision "to defend, indemnify and hold [Allstate] harmless from and against any and all judgments, awards, liabilities, settlements, or other costs arising from such litigation, claim, or other action." Id. at 579. The West Virginia Supreme Court of Appeals found the language unambiguously provided for the recovery of attorney's fees. Id.

We agree with the district court that a general agreement "to hold [KG] harmless from any cost, charge, expense or loss due to default under [the lease by KDC]" does not unambiguously provide for the recovery of attorney's fees and costs. While the language in the agreement in Harris expressly referred to

13

"costs arising from such litigation, claim, or other action," the language here regards only KDC's default. The provision reasonably includes costs, charges, expenses, or losses arising from KDC's default, such as the payment of unpaid royalties and property taxes. Deviating from the normal rules of West Virginia common law regarding the payment of attorney's fees, however, requires more clarity. If the parties specifically intended for the recovery of attorney's fees and costs under the suretyship agreement, they were capable of expressing their intent to do so unambiguously.

Our finding is supported by a provision of the lease that required KDC to "save harmless and defend, <u>including paying or causing to be paid the reasonable fees and expenses of counsel</u> reasonably selected by [KG], [KG] from all claims, loss, damage or injury to persons and property arising out of, from or incident to [KDC's] performance of [the lease.]" (emphasis added). This express agreement between KG and KDC for the recovery of KG's attorney's fees and costs in suits by third parties amplifies the ambiguity of the suretyship agreement, which made no express reference to attorney's fees. Indeed, the breach alleged by KG here was not KDC's failure to indemnify KG for some third party claim connected to the premises.

Furthermore, no other provision in the lease between KG and KDC automatically authorizes attorney's fees in the event of a

14

default.  An arbitration agreement, for example, governs "any disagreement or dispute between [KG] and [KDC] as to any covenants, agreements or conditions of [the lease], or as to the performance or nonperformance thereof."  But that agreement only provides that "costs [of the arbitrators] may be assessed to either [KG] or [KDC], or both of them," and that "any costs, fees, or taxes incident to enforcing an [arbitration] award shall . . . be charged against the party resisting such enforcement."  It makes no sense to require Pittston, as a surety, to pay attorney's fees and costs when it is unclear KDC, as the principal to the lease, would be required to do so.  Accordingly, the district court properly found the suretyship agreement did not unambiguously authorize attorney's fees and costs.

KG also contends that the district court erred in finding it was not entitled to post-judgment interest at a rate amounting to 5.25% per annum.  Specifically, KG asserts that language in the lease setting a rate of prime (3.25%) plus 2% to unpaid royalties applies to the judgment as well.  We disagree.

The standard rate applied to post-judgment interest equals "the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding." 28 U.S.C. § 1961(a). This rate is applied in diversity cases. Forest Sales Corp. v.

15

<u>Bedingfield</u>, 881 F.2d 111, 113 (4th Cir. 1989). However, despite the rate provided in § 1961(a), parties may " 'stipulate a different rate, consistent with state usury and other applicable law.' " <u>Carolina Pizza Huts, Inc. v. Woodward</u>, 67 F.3d 294 (4th Cir. 1995) (unpublished table decision) (quoting <u>Hymel v. UNC, Inc.</u>, 994 F.2d 260, 266 (5th Cir. 1993)).

We find the district court properly denied KG's motion to alter or amend the judgment in order to apply a 5.25% post-judgment interest rate. In denying the motion, the district court cited the doctrine of merger, which it explained was "the basic principle that a contract merges into the judgment." Under the doctrine of merger, any contractual rights are extinguished as they are "changed into a matter of record and merged in the judgment, and the plaintiff's remedy is upon the later security while it remains in force." <u>J. & G. Const. Co. v. Freeport Coal. Co.</u>, 129 S.E.2d 834, 838 (W. Va. 1963) (internal quotation marks omitted).

Because of the doctrine of merger, other circuits have required that the parties first "specify a post-judgment interest rate" using "clear, unambiguous and unequivocal language." <u>Westinghouse Credit Corp. v. D'Urso</u>, 271 F.3d 96, 102 (2d Cir. 2004); <u>see also</u> <u>Society of Lloyd's v. Reinhart</u>, 402 F.3d 982, 1004 (10th Cir. 2005); <u>Kotsopoulos v. Asturia Shipping Co.</u>, 467 F.2d 91, 95 (2d Cir. 1972) ("Once a claim is reduced to

16

judgment, the original claim is extinguished and merged into the judgment; and a new claim, called a judgment debt, arises. A single rule should govern interest on any such debt, the nature of the original claim having become irrelevant under the doctrine of merger." (citation omitted)). These opinions are consistent both with the law of this circuit and the common law of West Virginia. See Carolina Pizza Huts, 67 F.3d 294; State ex rel. State Bldg. Comm'n v. Moore, 184 S.E.2d 94, 109 (W. Va. 1971) ("[I]f the contract provides for a certain rate of interest until the principal sum is paid . . . the contract governs until the payment of the principal or until the contract is merged in a judgment.").

Reviewing the lease, we find no express agreement to overcome the doctrine of merger and § 1961(a). Specifically, the agreement was that "[a]ny payment not promptly made by [KDC] to [KG] shall bear interest from the date due at two percentage (2%) points per annum above the prevailing prime interest rate then charged by Bank One, West Virginia, N.A." Without the necessary clear, unambiguous, and unequivocal language indicating the parties' express intent to agree on a post-judgment interest rate, a finding otherwise is unwarranted.

## IV.

Based on the foregoing, we affirm the judgment of the district court.

AFFIRMED